**ELI LILLY & COMPANY, Plaintiff,**

v.

**Gerald CRABTREE and Jorge Plutzky, Defendants,**

and

**The United States, Defendant/Intervenor.**

No. 1:03–cv–520–LJM–WTL.

United States District Court, S.D. Indiana, Indianapolis Division.

March 29, 2006.

Donald E. Knebel, Erin Roth Bohannon, Jeff M. Barron, Todd G. Vare, Anthony Howard Green, Barnes & Thornburg LLP, Indianapolis, IN, for Plaintiff.

Catherine Elizabeth Fienning, Jacqueline R. Knapp, Mitchell G. Stockwell, Kilpatrick Stockton LLP, Atlanta, GA, Raymond A. Basile, Stephen E. Arthur, Harrison & Moberly, Jill E. Zengler, United States Attorney's Office, Indianapolis, IN, Erica Anne Franklin, Gary L. Hausken, Jon Tornquist, United States Department of Justice, Washington, DC, for Defendants.

### ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT DECLARING INVENTORSHIP

McKINNEY, Chief Judge.

This cause is now before the Court on plaintiff's, Eli Lilly & Company ("Lilly"),

Motion for Summary Judgment on the Defendants', Dr. Gerald Crabtree ("Dr. Crabtree") and Dr. Jorge Plutzky ("Dr. Plutzky") (collectively, the "Doctors"), Correction of Inventorship Claim. The issue is whether or not the Doctors, should have been named as co-inventors of three Lilly-owned patents: U.S. Patent Nos. 4,775,624 ("the '624 patent"), 5,151,268 ("the '268 patent"), and 5,270,040 ("the '040 patent") (patents collectively, "patents in suit"). Defendant/Intervenor, the United States (all defendants collectively, "Defendants"), join the Doctors in their opposition to Lilly's motion for summary judgment on the inventorship issue. The Court held a hearing on this matter on Thursday, March 23, 2006, at which each party answered questions posed by the Court.

For the reasons discussed herein, the Court **GRANTS** Lilly's Motion for Summary Judgment Declaring Correct Inventorship.

## I. *BACKGROUND*

### A. THE PATENTS IN SUIT

This lawsuit concerns a dispute over the correct inventors of the technology contained in three patents owned by Lilly: U.S. Patent Nos. 4,775,624 (the "'624 patent"), 5,151,268 (the "'268 patent"), and 5,270,040 (the "'040 patent") (collectively, the "patents in suit"). The '624 patent, issued to Lilly on October 4, 1988, is based on an application filed by Lilly on February 8, 1985. The '268 patent, issued to Lilly on September 29, 1992, is based on a divisional application of an original application, which was filed July 5, 1988. The '040 patent, issued to Lilly on December 14, 1993, is based on a divisional application, filed July 1, 1992, of the July 5, 1988, application. All of the patents share the identical written description.

All of the patents are related to the method of production, or use of a DNA compound, human protein C. The '624 patent is directed to constructed DNA compounds that encode human protein C, plasmids and host cells comprising such DNA compounds, and methods of using such elements to make human protein C through recombinant techniques. The '624 patent claims a nucleotide sequence that is 461 amino acids long. '624 Patent. The '268 patent is directed to methods of treating or preventing vascular disorders through recombinantly produced human protein C. '268 Patent. And, the '040 patent is directed to the method of production of a pharmaceutical composition, which has recombinantly produced human protein C as its active ingredient. '040 Patent.

### B. THE TECHNOLOGY

The Court will forego a lengthy discussion of recombinant DNA technology in favor of a more specific explanation of the parts of the process relevant to the question of inventorship. Knowing the DNA sequence of a particular gene enables the production of the protein encoded by such gene in quantities not otherwise possible. This is accomplished, generally, by inserting the DNA sequence of interest into a suitable host cell, in a process called transfection or transformation, and inducing the cell to make the protein in the course of its function as instructed by the DNA. Suitable host cells include bacterium, yeast, plant, or animal cells. Pl.'s Exh. A.5, MacGillvray Rep., at 10. This general concept of inserting and expressing foreign (or exogenous) isolated DNA in host cells is referred to as recombinant DNA technology. *Id.* at 23–27, 33–34.

In this process, instead of working with genomic DNA, which contains non-coding introns, or mRNA, which does not contain non-coding introns but is unstable, scientists use an artificial DNA construct

known as copy or complementary DNA, or "cDNA." Pl.'s Exh. A.7, Long Decl. ¶¶ 13–14. cDNA has the same sequence as the DNA of a gene to the extent that sequence actually contains the code for a particular protein, but does not have the non-coding introns. Pl.'s Exh. A.5, MacGillvray Rep. at 10, 22, 33–36; Pl.'s Exh. A.7, Long Decl. ¶ 14.

To begin a search for and to isolate DNA sequences of interest for insertion into host cells, all or most of the mRNA that exists in a particular living tissue, such as the liver, are converted into cDNA, creating a "cDNA library." Pl.'s Exh. A.5, MacGillvray Rep. at 40. A cDNA library will contain tens of thousands of so-called colonies, each colony containing a complete or partial DNA sequence (absent introns) that codes for all or part of its related protein. Id. at 40–43.

Once a library has been created, it can be probed, or screened, for a DNA sequence of interest. A probe is a single strand of nucleotide constructed to be homologous in sequence to the DNA sequence of interest, using information that may be known, for example, about the amino acid sequence of the target protein or the DNA sequence of the target gene in a homologous, or closely related, species. Since a strand of nucleotides tends to bind to strand that are complementary to it, a probe will tend to bind discriminately to those colonies in the library containing DNA sequences similar to it. For example, a cDNA probe derived from a particular gene in the cow or bovine might be used to probe a human cDNA library. Because of the high homology or similarity between humans and bovines at a DNA level, any fragment of a human cDNA library that binds to the bovine probe is likely to, although not definitively, correspond to that gene in humans. Id. at 45–46.

Use of a probe requires a recombinant technique called colony hybridization to encourage bonding of the probe to the specific cDNA of interest. Hybridization—whether same species or cross-species—is a process in which the cDNA of the library is exposed to heat or extreme (either high or low) acidity to cause the cDNA's two strands to separate, after which the probe is introduced. If some part of the cDNA library is complementary (or close to being complementary) to the probe's sequence, the probe will bind to that cDNA section, forming a hybrid containing one strand of probe cDNA material bound to one strand of complementary cDNA material from the library. Because the probe is typically tagged in some way, such as with a radioactive isotope, the hybrid can be identified and isolated from the remaining material. Id. at 45–47.

The basic techniques for both same species and cross-species hybridization with cDNA libraries were well known in 1983. Pl.'s Exh. A.7, Long Decl. ¶ 16. However, the particular conditions that will work for various proteins and species are a matter of trial and error, with a multitude of conditions potentially yielding good results. The same conditions may work in one laboratory and not in another, and developing particular conditions is a matter of routine experimentation for those with experience in the art. Id.; Pl's. Exh. A.5, MacGillvray Rep., at 46.

Once hybridization has occurred with a particular DNA sequence of interest, there has to be confirmation that the sequence actually relates to the gene that is being sought and is not a false positive. Pl.'s Exh. A.7, Long Decl. ¶ 15. This can involve sequencing the material, attempting to express the protein with it, or other tests. Id. ¶ 16; Pl.'s Exh. A.5, MacGillvray Rep., at 47–48.

In 1984, the recombinant technique of DNA sequencing was a time-consuming, manual process. Any sequence more than

a very short segment would be broken up into further fragments through the application of restriction enzymes that would cleave or cut the DNA. Once cut, the individual fragments could be manually sequenced. Ultimately, the goal is to obtain the coding information for the target gene, which may require the use of multiple probes, clones and sequencing efforts. Pl.'s Exh. A.5, MacGillvray Rep., at 47–48.

Once the cDNA sequence for a particular protein has been identified, the protein can be expressed by introducing the coding region of the cDNA into a host cell in such a way that it is transcribed and translated. Foreign DNA may be introduced into a bacterial host cell using a variety of transfection methods such as calcium chloride transfection, electroporation, or microinjection. Methods for introduction of DNA into mammalian cells include, for example, calcium phosphate precipitation, chemical shock, and viral transfection. Because several techniques exist for introducing foreign DNA into a cell, multiple approaches are typically used to obtain the highest efficiency of DNA uptake in the cell type used. *Id.* at 40.

### C. HISTORY, STRUCTURE & BIOLOGY OF PROTEIN C

Human protein C is an inactive protein present in blood plasma. In consort with other proteins, protein C functions as an important component of the complex chain of events responsible for blood clotting or thrombosis. '624 Patent, col. 1, *ll.* 22–24.

Human protein C is synthesized in the liver and expressed as a single polypeptide chain. This polypeptide, however, must be modified extensively by biological processes after translation, for which vitamin K is required, to generate "activated protein C," which has two polypeptide chains—a "light chain" and a "heavy chain"—linked by chemical bonds. *Id.* col. 2, *l.* 65, to col.

3, *l.* 30. Because of its dependency on vitamin K, human protein C is a "vitamin K-dependent" protein.

Activated protein C is the form of human protein C from which a short activation peptide has been cleaved. Pl.'s Exh. A.7, Long Decl., n. 1. It takes this form in the presence of thrombin, in which it destroys certain blood clotting or coagulation factors to regulate the coagulation factor. '624 Patent, col. 1, *l.* 33, to col. 2, *l.* 40. Because it only operates in the presence of other blood factors, activate protein C has been described as "an *on-demand* anticoagulant of wide clinical utility for use as an alternative to heparin and the hydroxycoumarins." *Id.* col. 2, *ll.* 40–42 (emphasis in original).

Protein C was first discovered in 1976. Pl.'s Exh. A.7, Long Decl. ¶ 9. A year later, the anticoagulant properties of bovine plasma protein C were disclosed. *Id.* In 1979, it was disclosed that activated protein C inhibited blood coagulation. *Id.* Also in 1979, the purification and partial characterization of human protein C was reported. *Id.* The report disclosed partial amino acid sequence information for both the light and heavy chains, amino acid composition analysis, and certain structural detail. The publication also reported on the similarities between human protein C and bovine protein C. *Id.*

In October 1982, two scientists, J. Stenflo and P. Fernlund, published the light chain amino acid sequence and heavy chain amino acid sequence for bovine protein C. *Id.*

In 1983, the role of protein C. in the coagulation process was described. *Id.* Also in 1983, the function and physiology of protein C, as well as certain disease states associated with protein C, was reported. *Id.*

## D. THE PROTEIN C PROJECT

In the early 1980s, Lilly was interested in researching proteins that are part of the molecular pathway that regulates blood clotting. *Id.* ¶ 5. Lilly had begun work on cloning the cDNA for a clotting factor known as human tissue plasminogen activator ("TPA") and desired to expand its research into more proteins in this area, including protein C. *Id.*

In 1982, Lilly hired Dr. George Long ("Dr. Long"), a named inventor of the patents in suit, to investigate therapeutic agents for use in treating hemostatic (blood related) disorders, including protein C. *Id.* ¶¶ 4–5.

Before joining Lilly, Dr. Long was a Senior Research Fellow in the laboratory of Dr. Earl W. Davie ("Dr. Davie") at the University of Washington. *Id.* ¶ 6. While at the University of Washington, Dr. Long was aware of the work by Dr. Davie and other scientists in Dr. Davie's laboratory on characterizing the cDNA and gene coding for human prothrombin, a protein that also involved regulation of blood clotting. *Id.* ¶ 7. This research effort involved the use of a bovine cDNA probe to screen a human liver cDNA library for the presence of prothrombin. *Id.* Dr. Long provided advice and assistance in this research effort, which was published in 1983. *Id.*, Exh. A.

In 1982, at the time Dr. Long joined Lilly, he was familiar with using cross-species hybridization to obtain cDNA information, in particular the use of bovine cDNA probes to screen a human liver cDNA library for the cDNA sequence coding for a human protein, which was a technique based on the high degree of homology between bovine and human DNA. *Id.* ¶ 8. Dr. Long was also aware of the scientific literature in the areas relating to human protein C, bovine protein C, and their relationship. *Id.* ¶ 9.

As of July 1983, Dr. Long had developed a written cloning strategy for human protein C, in which he would first identify the complete cDNA sequence for bovine protein C and then use that sequence as a probe to screen a human liver cDNA library for human protein C. *Id.* ¶ 12. From the previously published amino acid sequence for bovine protein C, the general homology of human and bovine, the prior publications of Drs. MacGillivray and Davie, and his own work with Dr. Davie, Dr. Long expected that using his bovine protein C cDNA probe would successfully hybridize when used with human protein C. *Id.* ¶¶ 12–13, 21. He also expected that a liver cDNA library would be the logical choice, based on evidence that protein C was synthesized in nature by the liver. *Id.* ¶¶ 15, 18.

As a first step in his cloning strategy, Dr. Long began work in August and September 1983, to obtain the cDNA sequence for bovine protein C. *Id.* ¶ 17. Dr. Long used short DNA fragments (called oligonucleotides, which were synthesized from the known partial amino acid sequence for bovine protein C) to screen a bovine cDNA library. *Id.* Dr. Long obtained the first complete composite bovine cDNA sequence by December 1983, which was then first published in September 1984. *Id.*

Prior to obtaining the full-length bovine cDNA sequence, Dr. Long created 660 and 415 base pair probes from the 3' region of the bovine cDNA sequence for use in probing a human liver cDNA library. *Id.* ¶¶ 17–18, 21.

In August 1983, at the same time Dr. Long began his work to identify the full length cDNA sequence for bovine protein C, Dr. Long also initiated work in his laboratory to construct a human liver cDNA library. *Id.* ¶ 19. Apparently, Dr. Long assigned part of this work to Lilly employee JoAnn Hoskins ("Hoskins"), who

worked in Dr. Long's laboratory. Pl.'s Exh. A.6, MacGillivray Rebuttal Rep., ¶ 12. This effort, using two frozen samples of liver obtained from the University of Iowa, ultimately failed. Pl.'s Exh. A.7, Long Decl. ¶¶ 19–20. It was not until March 27, 1984, that another Lilly scientist, Robert Beckmann ("Beckmann"), produced a human liver cDNA library. *Id.* ¶ 34.

In late 1983, Dr. Long became aware that Dr. Gerald Crabtree ("Dr. Crabtree"), then affiliated with the Nation Institutes of Health ("NIH"), had access to at least one human liver cDNA library. *Id.* ¶ 21. Dr. Long requested Dr. Crabtree's cDNA library and, on or about November 29, 1983, Dr. Long received from Dr. Crabtree a nitrocellulose filter that contained the Crabtree human liver cDNA library. Pl.'s Exh. 10, Lab. Notebook AG1, George Long, at CP 2502 0923A ("Long AG1 NB"). In his lab notebook, Dr. Long recorded hybridization conditions suggested by Dr. Crabtree for using a bovine probe against a human liver cDNA library. *Id.* The notebook also reveals that the conditions were based on Dr. Crabtree's use of mouse cDNA to probe human liver libraries, apparently, in prior work. *Id.* Pl.s' Exh. A.7, Long Decl. ¶ 23.

Cross-species hybridization conditions were well known and published in the literature. Pl.'s Exh. A.7, Long Decl. ¶ 23; Pl.'s Exh. A.5, MacGillivray Rep., at 46; Pl.'s Exh. A.6, MacGillivray Rebuttal Rep. ¶ 6. There was no one specific, or unique, set of hybridization conditions that would work, rather, known hybridization conditions would commonly be modified and optimized by trial and error in the lab. Plutzky Dep. at 235.; Crabtree Dep. at 296–97. As Dr. Jorge Plutzky ("Dr. Plutzky") testified, "[a]ny set of hybridization conditions could in any given experiment on any given day work or not work." Plutzky Dep. at 224–25. Ultimately, Dr. Long did not use Dr. Crabtree's conditions

in their entirety, rather, he varied the conditions, consistent with published cross-species hybridization conditions for bovine-human. Pl.'s Exh. A.7, Long Decl. ¶ 22; Pl.'s Exh. A.6, MacGillivray Rebuttal Rep. ¶¶ 33–34.

Dr. Long screened the Crabtree human liver cDNA library using Dr. Long's 660 base pair bovine probe, however, Dr. Long did not obtain any hybridization between the library cDNA and the bovine DNA probe, which indicated that no protein C-related genetic material had been detected. Pl.'s Exh. A.7, Long Decl. ¶¶ 22–23. In other words, Dr. Long's attempt to probe the Crabtree human liver cDNA library was a failure.

At about the same time, late 1983, Dr. Long sent his 660 base pair bovine probe to Dr. Crabtree for Dr. Crabtree to use with his library at the NIH. *Id.* ¶ 24. Dr. Crabtree assigned the task of performing the screening of the cDNA library to then Mr., now Dr., Jorge Plutzky ("Dr. Plutzky"), who had then recently joined Dr. Crabtree's laboratory. Crabtree Dep. in *Ok. Med. Res. Found. v. Eli Lilly & Co.,* No. CIV–01–456, Mar. 18, 2003, at 74 ("Crabtree *OKMRF* Dep."). At the time he performed this work, Dr. Plutzky had "minimal" experience with cDNA, and none of his prior work had involved hybridization using probes. Plutzky Dep. at 264–66. Any work done by Dr. Plutzky on this project was recorded in his lab notebooks. Crabtree Dep. at 91. Dr. Crabtree destroyed his own lab notebooks from this time period, therefore, there is no record of any work Dr. Crabtree did on protein C. *Id.* at 90–91, 280.

According to Dr. Plutzky's lab notebooks, by December 1983, Dr. Plutzky had used Dr. Long's bovine probe and obtained different degrees of hybridization between the bovine probe and cDNA fragments varying in length from roughly 200 to 700

base pairs, from six clones, which Dr. Plutzky thought likely related to human protein C. Pl.'s Exh. 17, Plutzky Lab. Notebook, at C000467–89 ("Plutzky L.NB"). Only passing reference is made to Dr. Crabtree in Dr. Plutzky's notebook, and no references describe any work performed by Dr. Crabtree. *Id.* After this work, Dr. Plutzky concentrated on a single cDNA clone. *Id.*

In a lab notebook entry dated January 4, 1984, Dr. Plutzky notes "mail purified PC," and "mail stuff." *Id.* at C000489.

Before, on, or about January 31, 1984, Dr. Long noted in his lab notebook

Jerry Crabtree (NIH) identified potential human liver cDNA clones for protein C, using a 660bp bovine probe sent by me (see p. 67, 151 of sample was sent to him). He "pulled" the positive colony(s) from high density plates, plated on agar and sent them to me. The inserts are in the *Pst* site of pBR322 and the host is *E. coli* strain DH1, from Chambon's lab. The three plates represent three different isolates from 12 positives. It is known that # T3B is impure & the other two may be also because of the screen being high density.

Pl.'s Exh. 10, Long L.NB, at CP 2502 0946A. Dr. Long and Dr. MacGillivray believe that the reference to the samples' impurity suggested that what Dr. Long received from Dr. Crabtree's laboratory was mixed cDNA fragments, not purified cDNA. Pl.'s Exh. 7, Long Decl. ¶ 25; Pl.'s Exh. 6, MacGillivray Reb. Rep. ¶ 39; MacGillivray Dep. at 84.

Neither Dr. Crabtree nor Dr. Plutzky ever attempted to determine the sequence of any fragments sent to Dr. Long; nor did the Doctors otherwise confirm that the material in question was related to human protein C cDNA. Crabtree Dep. at 394–95; Plutzky Dep. at 174–75; Griffin Dep. at 341–42. At most, in December 1983, Dr. Plutzky suspected that he had material related to human protein C cDNA, although he admitted that it could have been related to a homologous protein. Plutzky Dep. at 181–83, 199–200, 203–04; Crabtree Dep. at 394–95, 453.

As a next step, Dr. Long re-plated at a lower density the samples he received from Dr. Crabtree's laboratory in order to facilitate isolation of pure, individual clones. Pl.'s Exh. 7, Long Decl. ¶ 26; Pl.'s Exh. 10, Long L.NB, at CP 2502 946A. The technique Dr. Long used was "standard microbiological practice." MacGillivray Dep. at 84–85. By doing this procedure, Dr. Long was able to isolate three clones, which he labeled pHC–3, pHC–7 and pHC–8. *Id.* Dr. Long stated in his lab notebook that it appeared that pHC–7 and pHC–8 were identical, and that pHC–3 seemed somewhat larger. *Id.* Apparently, at Lilly pHC–8 became known as "Crabtree's Clone" and/or "pHC–8 (Crabtree)." Def.'s Exh. 1, Hoskins Lab. Notebook, at CP 2505 402 ("Hoskins L.NB"); Hoskins Dep. at 136; Pl.'s Exh. 10, Long L.NB, at CP 2502 1043A.

Using standard DNA sequencing techniques, by the end of February 1984, Dr. Long had sequenced roughly 20% of pHC–3 and pHC–8. Pl.'s Exh. 10, Long L.NB, at CP 2502 0954A–55A. Dr. Long computer-filed his handwritten sequence in "[GEORGE]PHC8.SEQ." *Id.* at CP 2502 0955A.

In early March 1984, Dr. Long used the "Southern blotting" technique to ensure that the pHC–3 and pHC–8 fragments were protein C. *Id.* at CP 2502 0962A–64A.

Throughout March, and until March 27, 1984, Dr. Long sequenced fragments of pHC–8, recording the individual sequences by hand in his lab notebook. *Id.* at CP 2502 0966A–75A. On March 27, 1984, Dr. Long computer-recorded the entirety of his work in a filed labeled: [GEORGE]CRABPHC. SEQ. *Id.* at CP 2502 0976A. Dr. Long knew that the pHC–8 sequence

was not the entire sequence of protein C. Pl.'s Exh. 7, Long Decl. ¶ 32. Moreover, eventually, Dr. Long learned that the sequence of pHC–8 in his notebook was wrong; he hand corrected the handwritten version at some later, unverifiable, date, but there is no evidence that he ever corrected the computer file. *Id.* ¶¶ 45–46.

By the end of March 1984, Lilly researchers, Hoskins and Beckmann had constructed at least one human liver cDNA library for use in screening for cDNA clones coding for human protein C. Beckmann Decl. ¶¶ 8–11. In constructing this cDNA library, Lilly researchers had used a new technique for cDNA synthesis designed to produce "full-length clones." *Id.* ¶¶ 9–10. On March 26, 1984, Beckmann provided plates of his cDNA library to Dr. Long to probe for a clone containing the protein C gene. *Id.* ¶ 9.

On March 27, 1984, Dr. Long recorded in his lab notebook that he received the plates of the cDNA library from Beckmann. Pl.'s Exh. 10, Long L.NB, at CP 2502 0978A. Dr. Long also recorded in his lab notebook his intent to use his bovine cDNA probe to screen Beckmann's liver cDNA library. *Id.* Dr. Long implemented his plan and used known cross-species hybridization techniques to probe the new library. Long Decl. ¶ 22. Although it appears that the conditions Dr. Long used were those suggested by Dr. Crabtree, Dr. Long did make certain modifications to Dr. Crabtree's suggested conditions, including using a different temperature and a different solution concentration. Pl.'s Exh. 10, Long Lab NB, at CP 2502 0923A, CP 2502 0946A, CP 2502 0978A–79A; Pl.'s Exh. 6, MacGillivray Reb. Rep. ¶¶ 6, 32–34.

Dr. Long's first attempt to probe Beckmann's cDNA library failed. Pl.'s Exh. 10, Long L.NB, at CP 2502 0988A. In late

April 1984, Dr. Long performed a high-density hybridization and obtained positive colonies. *Id.* at CP 2502 0988A–93A. The positive colonies were replated at lower density using "Southern Blotting/hybridization." *Id.* at CP 2502 0991A, CP 2502 0994A. During this procedure, pHC–8 was grown out "as a positive control." *Id.* CP 2502 0994A.

Dr. Long eventually focused on an approximately 1,100 base pair cDNA fragment that positively hybridized to the bovine probe. Long Decl. ¶ 37, Pl.'s Exh. 10, Long L.NB, at CP 2502 0994A–96A; Pl.'s Exh. 6, MacGillivray Reb. Rep. ¶¶ 22–24. This cDNA clone was eventually labeled pHC–1. Long Dep. at 153–55; Long Decl. ¶ 37, Pl.'s Exh. 6, MacGillivray Reb. Rep. ¶ 24.

As of May 21, 1984, Dr. Long had sequenced pHC–1 sufficiently to know that, based on a comparison with his bovine cDNA sequence, pHC–1 contained essentially all of the 3′ end of the coding sequence of human protein C mRNA, including the stop codon and some non-coding sequence. Long Decl. ¶ 38.

To identify the still missing 5′ region of the coding sequence for human protein C, Dr. Long created a bovine cDNA probe targeted to the 5′ region of the bovine protein C cDNA sequence. *Id.* ¶ 39. He provided this probe to Beckmann, who used it against the Lilly liver cDNA library. *Id.* ¶¶ 39–40; Beckmann Decl. ¶¶ 13–18.

Beginning on May 7, 1984, Beckmann screened his cDNA library with Dr. Long's bovine cDNA probe. Beckmann Decl. ¶ 13. Beckmann recorded in his lab notebook:[1]

---

[1] The parties submitted Beckmann's laboratory notebook with two different exhibit numbers and each exhibit uses a different numbering system. Where possible, the Court will refer only to the Plaintiff's Exhibit for continuity and ease of reference.

A partial cDNA clone has already been identified by colony hybridization of the human liver cDNA library [G Long]. This clone was found using specific nucleotide probe homologous to a 3' region of the cDNA. The cDNA library will be screened again, this time using a probe specific for the 5' region of the cDNA. Hopefully, either a full-length cDNA clone will be found or a partial one, that can be joined with the partial 3' clone to generate one that is complete.

Pl.'s Exh. 12, Beckmann Lab. Notebook, at CP 2524 386 ("Beckmann L.NB").

On May 21, 1984, Beckmann selected twenty of the strongest hybridizing colonies from this first screen and performed a second screen using the same 140 base pair bovine probe. *Id.* at CP 2524 406–16. Beckmann also screened his cDNA library with an oligonucleotides probe synthetically constructed to correspond with a portion of the human genomic clone isolated by Dr. Crabtree, and used in Hoskin's work, and a 660 base pair fragment of bovine protein C. *Id.* at CP 2524 414–15.

After identifying six strongly hybridizing positive colonies from this second screen from both the 140 base pair bovine probe ("probe 'a' ") and the synthetic human genomic clone probe ("probe 'b' "), and six weaker colonies from probe "a", Beckmann performed a "miniscreen." *Id.* at CP 2524 439–47. Clone # 12 was a colony from filter 6C2, which had a positive hybridization by both probes "a" and "b." *Id.* at CP 2524 439–41. Beckmann eventually named clone # 12 "pBHC12." *Id.* at CP 2524 451.

Beckmann originally selected colony or clone # 8 for sequencing. *Id.* at CP 2524 448. *See also* Beckmann Decl. ¶¶ 14–15. Beckmann labeled the selected colony pBHC–8. Beckmann Decl. ¶ 15. When he compared the sequence he had obtained from pBHC–8 to the full amino acid sequence of bovine protein C developed by

Dr. Long, and limited portions of the predicted amino acid sequence obtained by Hoskins of a fragment of genomic human protein C, Beckmann determined that pBHC–8 likely contained the start codon (indicated by the amino acid methionine) for the cDNA coding for human protein C, but was too short to overlap with the cDNA clone isolated and sequenced by Dr. Long. *Id.* ¶¶ 15–16; Beckmann L.NB, at CP 2524 449–51 (stating, in part, that there "is 100% amino acid homology between the genomic human clone and this cDNA and greater than 80% amino acid homology with the bovine clone"). Beckmann then selected a larger clone, pBHC–12, from the set of six positives identified in his second screen for further analysis. Beckmann Lab NB, at CP 2524 451.

Beckmann and J. Shepard did a partial sequence of pBHC–12. *Id.* at CP 2524 452–65. Beckmann compared this partial sequence to that of pBHC–8, where he noted "100% homology between the two sequences where they overlap. We can therefore safely assume that pBHC–12 is also a cDNA clone of human protein C." *Id.* at CP 2524 465. In addition, Beckmann confirmed that pBHC–12 contained both the missing 5' end of the coding sequence and overlapped with pHC–1. *Id.* Beckmann wrote the following in his lab notebook:

> Most importantly is the fact that this clone overlaps with the 3' clone pHC–1 isolated by G. Long. This means we now have sequence representing the entire mRNA of human Protein C. In future experiments we will attempt to combine the two clones together so we may have the entire cDNA represented by one clone.

*Id.* The partial sequence of pBHC–12 recorded in Beckmann's lab notebook lacked information from nucleotide 373 to 395. *Id.* at CP 2524 264. Nucleotide 374 corre-

sponds to the first nucleotide of amino acid 51; nucleotide 395 corresponds to amino acid 58. Defs.' Exh. 15, Nucleic Acids Research Paper, at 5239. Therefore, the partial sequence of pBHC–12 in Beckmann's notebook lacks information from amino acid 51 through 58. *Id.;* Beckmann's L.NB, at CP 2524 264.

On July 5, 1984, Dr. Long began experiments to further sequence pBHC–12, which he had received from Beckmann. Long L.NB, at CP 2502 1021A. On August 8, 1984, Dr. Long continued his work with both pHC–1 and pBHC–12. *Id.* at CP 2502 1031A.

In a January 16, 1984, to July 16, 1984, report, Dr. Long reported the following:

## II.  *Human Protein C cDNA Cloning*

Work on the cloning and expression of protein C has continued. The second phase of this project, the cloning of human liver cDNAs and their characterization has been completed and is summarized in this section.

During the last six months a human liver cDNA library has been constructed by Bob Beckmann and JoAnn Hoskins. The cDNA synthesis was performed by Bob Beckmann and is described in Bob Santerre's group report. A very brief summary of the synthesis and library construction is presented in Figure 1. The resulting human liver library was initially screened by George Long with a 600 [base pair] 3′ terminal region bovine cDNA probe, shown in Figure 2. Out of library of 43,000 transformants, six protein C clones were identified, the largest of which (pHC–1) contained 1,100 [base pair] *Pst* insert. DNA sequencing and restriction mapping revealed that the clone lacked the 5′ coding portion. Consequently, a second round of screening was performed with the assistance of Bob Beckmann using a 140 [base pair] 5′ bovine cDNA probe (see Figure 2). Ap-

proximately 160,000 colonies were screened, which ultimately resulted in three identified protein C clones. The largest clone (pBHC–12) contains a 550 [base pair] insert and overlaps with clone pHC–1 by approximately 90 [base pair]. Table 1 presents a summary of the human cDNA library screening for protein C. Clones pBHC–12 and pHC–1 together contain the entire coding region for human protein C as well as 70 [base pair] of non-coding sequence at the 5′ and 3′ ends. The entire DNA sequence of the above two clones has recently been completed and is in the process of being confirmed. The bovine and human molecules are remarkably similar, with 74% and 82% identity at the amino acid and nucleic acid levels, respectively.

There exists within the common 90 [base pair] region of clones pHC–1 and pBHC–12 a *Kph1* restriction endonuclease site. This site has been employed to perform partial digestion of the inserts, in order to generate upon ligation a complete, contiguous coding segment in the pBR322 vector. The resulting material has been used to transform cells and the desired plasmid has been identified. Plasmid DNA has been prepared for use in the attachment of suitable adaptor oligonucleotides for insertion into eukaryotic expression vectors.

## III.  *Human Protein C Gene Analysis*

A collaborative project with Dr. Crabtree, National Cancer Center [sic], has been initiated to determine the structure of the human protein C gene, and the molecular basis for human protein C deficiency. Dr. Crabtree, with the use of bovine protein C cDNA probes provided by this laboratory, has isolated a 14Kb segment of human genomic DNA from a Tυ library originally generated in Phil Leder's lab. This material has

been sent to our laboratory for extensive restriction mapping and DNA sequencing of the exonic portions and the intron/exon junctions. Our approach has consisted of first identifying small genomic subfragments which hybridize with limited protein C cDNA (ie coding) segments, followed by DNA sequencing of the identified fragments. These analyses have been the major activity of JoAnn Hoskins during the past six months, and have been supported by John Shepherd who has done the major portion of the DNA sequencing. Our understanding of the gene structure is summarized in Figure 4.

Pl.'s Exh. 9, Lilly Progress Rep., Jan. 6, 1984–July 15, 1984, at 2–3 (some typographical errors may have been made because the copy quality of the exhibit is poor). As noted in the text, the January to July 1984, progress report contained diagrams of the two bovine cDNA probes used by Dr. Long and Beckmann in their hybridization screens of Lilly's cDNA library, and diagrams of where the pBHC–12 and pHC–1 clones were located in comparison to the region of the bovine cDNA probes. *Id.* at CP 4 2077–78. In addition, the January to July 1984, progress report contained a diagram of Lilly's human liver cDNA screening for protein C. *Id.* at CP 4 2080.

As of July 15, 1984, Lilly had only a rough estimate of where the genomic materials and introns were in comparison to the cDNA sequence, which contains only exons. Long Decl. ¶ 54.

Beginning in July 1984, Beckmann and other Lilly researchers, including Dr. Santerre and Dr. Long, began work on ligating, or joining, the two cDNA clones, pBHC–12 and pHC–1, so that a single DNA compound would contain all of the coding sequence for human protein C in cDNA. Beckmann Decl. ¶ 21, Exh. 2, Lilly Progress Rep., July 16, 1984–Jan. 15, 1985,

at 2. The manipulation of the pBHC–12 and pHC–1 cDNA clones to construct plasmid pHC7 is reflected in Figure 1 of a Lilly progress report by Dr. Santerre dated July 16, 1984, to January 15, 1985. *Id.* Fig. 1. On September 11, 1984, Dr. Long "read" the DNA sequence of pBHC–12. Long L.NB, at CP 2502 1034A.

The next step in the Lilly project included the use of plasmid pHC–7 and other plasmids constructed by manipulating and ligating pBHC–12 and pHC–1 together to demonstrate that these plasmids, when inserted into vectors, encoded a polypeptide with human protein C activity in a variety of host cell lines, including mammal tissues and bacteria. Pl.'s Exh. 6, MacGillivray Reb. Rep. ¶¶ 53–56. The patents in suit describe various assays used by Lilly to confirm expression of protein C activity. '624 Patent, col. 54, *l.* 20 to col. 55, *l.* 33; Griffin Dep. at 170–71.

Expression techniques, including transfection techniques to get DNA into a cell, were known at the time for a range of host cells. '624 Patent, col. 55, *ll.* 28–31; Crabtree Dep. at 488–89; Griffin Dep. at 167–68. In fact, over the span of several months in 1984, Dr. Sheila Little ("Dr. Little"), a Lilly researcher, used multiple transfection protocols and suffered multiple failures, in her attempts to express protein C. Little Dep. at 47–49, 57, 63–68, 70–75; Defs.' Exh. DA3, Little Lab. Notebook, at CP 2509 50, 94–95, 107–09, 116, 121 ("Little L.NB"). Several of these were provided to Dr. Little by Dr. Crabtree. Little Dep. at 61, 63, 73–75, 81–82; Little L.NB, at CP 2509 50, 94–95, 107–09, 116, 121. In particular, on or about October 1984, Dr. Crabtree provided Dr. Little a transfection protocol developed by Dr. Crabtree specifically for HepG–2 cells. Little Dep. at 69–70; Little L.NB, at CP 2509 108–09; Defs.' Exh. 14, Crabtree Protocol.

Dr. Crabtree had synthesized this transfection protocol from publications and the work of other NIH scientists. Crabtree Dep. at 413–14. However, it was not optimized for protein C and, in particular, did not include the use of vitamin K as part of the method. *Id.* at 414, 487; Little L.NB, at CP 2509 108–09 (recording the transfection protocol received from Dr. Crabtree with the addition of vitamin K). Lilly researchers, including Dr. Nils Bang ("Dr. Bang"), established that vitamin K was critical to expressing significant amounts of protein C. Crabtree Dep. at 414, 487. But, it was known before 1983 that human protein C was a vitamin K-dependent serine protease that requires a post-translational modification of its zymogen form to become active. MacGillvray Dep. at 140–41. Lilly's expert testified that anyone working with a vitamin K-dependent protease would add vitamin K to the media during expression experiments. *Id.* at 143–44.

Dr. Little also worked on expression of protein C when she visited Dr. Crabtree's laboratory. Crabtree Dep. at 404, 406, 409. Dr. Little's work during that visit, in which she used Dr. Crabtree's methods, did not result in the expression of any protein C. *Id.* at 404, 406, 409. According to Dr. Crabtree, Dr. Little was the only person who tried to express protein C in his laboratory. *Id.* at 404, 406, 409.

Steps of Dr. Crabtree's transfection protocol were incorporated into the specification of the patents in suit. *Compare, e.g.,* '624 Patent, col. 53, *l.* 55, to col. 54, *l.* 19, *to* Defs.' Exh. 14, Crabtree Protocol & Little L.NB, at CP 2509 108–09.

Apparently, Dr. Little used a particular cell line from Dr. Crabtree in some of her efforts to express human protein C. Defs.' Exh. 16, Little Progress Rep., Jan. 16, 1985–July 15, 1985, at CP 28 0562–64 ("Little Jan.-July 1985 Rep."). Specifically, Dr. Little's progress report from the period between January 16, 1985, and July 15, 1985, states:

[W]e searched for a cell line that contained some level of endogenous γ- (carboxylation to prepare recombinant cells that could express human protein C). Such a cell line, FAZA[,] was given to us by G. Crabtree (NIH, now Stanford Univ[.] ). The FAZA rat cell is a hepatoma cell that normally expresses up to 40% carboxylated prothrombin.

\* \* \*

In an effort to express human protein C, we sought a cell line known to synthesize a large number of liver-specific proteins. Such a cell line[,] FAZA, derived from a cloned line of rat hepatoma cells was given to us by G. Crabtree (Stanford, Univ.). This cell line normally expressed prothrombin which is 30–40% carboxylated.

*Id.* at CP 28 0562–64. Dr. Crabtree communicated to a Lilly researcher that "FAZA cells are not easily transfected. . . ." *Id.* at CP 28 0564. When reviewing this document during her deposition, Dr. Little testified as follows:

Q  Why were you searching for a cell line that contained some level of endogenous carboxylation?

A  Because human protein C needed gamma carboxylation for the formation of an active protease.

Q  Now, did Gerald Crabtree suggest using the FAZA cell line then?

A  I don't recall. I'm reading.

Q  Do you have any reason to believe that Gerry Crabtree did not provide—or did not suggest the FAZA cell line to you?

A There's no reason to think that he did not suggest the FAZA rat cell line. Little Dep. at 130-31.

## E. GENOMIC SEQUENCING PROJECT

A genomic sequencing project was also ongoing at Lilly, with the collaboration of Dr. Crabtree and his lab, at the same time the cDNA project was ongoing. *See* Pl.'s Exh. 9, Lilly Progress Rep., Jan. 6, 1984—July 15, 1984, at 3. All the human protein C genomic clones used at Lilly between 1983 and 1985 came from Dr. Crabtree. Hoskins Dep. at 23–24, 85, 197–98; Defs.' Exh. DA1, Hoskins Lab. Notebook, at CP 2505 373, CP 2505 561 ("Hoskins L.NB"). Hoskins, a Lilly researcher who worked on the sequencing of the human protein C genome, was not aware of anyone at Lilly who had ever isolated a human protein C genomic clone or who even possessed a human genomic library. Hoskins Dep. at 197–98.

On May 4, 1984, Hoskins recorded in her lab notebook that the region from –19 through +3 8, which includes the start codon, had been identified in Dr. Crabtree's genomic clones. Defs.' Exh. DA1, Hoskins L.NB, at CP 2505 507. On June 15, 1984, Hoskins wrote: "We currently have coding sequence for a.a. –19 to +38 for genomic human protein C." *Id.* at CP 2505 536. On July 5, 1984, Hoskins identified the coding sequence of human protein from amino acid –47 through, and possibly beyond, amino acid +85. *Id.* at CP 2505 455. On July 10, 1984, Hoskins wrote: "Comparing sequence to Crab PHC have some problems don't [sic] have this region sequenced for our cDNA clones so will wait for comparison." *Id.* CP 2505 468. According to Hoskins' lab notebook entries dated July 12, 1984, in the genomic clones, Lilly had identified the amino acid sequence of human protein C from –19 through +85 with all junctions, and from amino acid –47 to –20. *Id.* CP 2505 476.

The genomic sequencing project by Lilly scientists in collaboration with Dr. Crabtree ultimately helped establish that pHC–7, the plasmid combining segments of pBHC–12 and pHC–1, tracked the sequence of genomic protein C, DNA. Crabtree Dep. at 436–37. Dr. Crabtree testified that this fact was not established until at least March 1985. *Id.*

## F. OTHER WORK INVOLVING HUMAN PROTEIN C

In August 1984, Dr. Earl Davie and Dr. David Foster published a partial DNA sequence reporting all of the coding information for the cDNA for human protein C found in pHC–8 and pHC1, but none of the sequence found in pBHC–12. Pl.'s Exh. 22, Donald Foster & Earl W. Davis, *Characterization of a cDNA Coding for Human Protein C,* 81 PROC. NATL. ACAD. SCI. USA 4766 (1984). Specifically, the sequence disclosed in the Davie and Foster publication began at amino acid # 62 and ended after the end of pHC–1, and the stop codon. *Id.;* Pl.'s Exh. 21, Robert J. Beckman, *et al., The Structure & Evolution of a 461 Amino Acid Human Protein C Precursor and its Messenger RNA, Based Upon the DNA Sequence of Cloned Human Liver cDNAs,* 13 NUCLEIC ACIDS RES. 5233, 5238 Fig. 2 (1985) ("Lilly Article").

On May 29, 1985, after Lilly had filed the patent application that gave rise to the patents in suit, Lilly submitted an article that reported all the sequences obtained in the human protein C effort to the publication "Nucleic Acids Research." Long Decl. ¶ 50. Nucleic Acids Research published the article in August 1985 and described the work that had been done to isolate pBHC–12 and pHC–1 using bovine probes. Pl.'s Exh. 21, Lilly Article. The paper also included all of the sequence obtained during this time period, including

the sequence of pHC–8 that overlapped with pHC–1 and the non-coding sequence of pHC–8 beyond the 3' end. *Id.* at 5239–41. The article states that pHC–8 "was isolated from a separate liver library generated by methods similar to those described in this paper." *Id.* at Fig. 2.

## II. *SUMMARY JUDGMENT STANDARD*

Summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). *See also CAE Screenplates v. Heinrich Fiedler GmbH,* 224 F.3d 1308, 1316 (Fed.Cir.2000). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the opposing party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A disputed fact is material only if it might affect the outcome of the suit in light of the substantive law. *See id.*

The moving party has the initial burden to show the absence of genuine issues of material fact. *See Wollin v. Gondert,* 192 F.3d 616, 620 (7th Cir.1999); *Schroeder v. Barth,* 969 F.2d 421, 423 (7th Cir.1992). This burden does not entail producing evidence to negate claims on which the opposing party has the burden of proof. *See Green v. Whiteco Indus., Inc.,* 17 F.3d 199, 201 & n. 3 (7th Cir.1994). The party opposing a summary judgment motion bears an affirmative burden of presenting evidence that a disputed issue of material fact exists. *See Wollin,* 192 F.3d at 621; *Gonzalez v. Ingersoll Milling Mach. Co.,* 133 F.3d 1025, 1031 (7th Cir.1998); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Scherer v. Rockwell Int'l Corp.,* 975 F.2d 356, 360 (7th Cir.

1992). Moreover, the opposing party must "go beyond the pleadings" and set forth specific facts to show that a genuine issue exists. *See Wollin,* 192 F.3d at 621; *Stop–N–Go of Madison, Inc. v. Uno–Ven Co.,* 184 F.3d 672, 677 (7th Cir.1999); *Hong v. Children's Mem. Hosp.,* 993 F.2d 1257, 1261 (7th Cir.1993), *cert. denied,* 511 U.S. 1005, 114 S.Ct. 1372, 128 L.Ed.2d 48 (1994). This burden cannot be met with conclusory statements or speculation, *see Cliff v. Bd. of Sch. Comm'rs,* 42 F.3d 403, 408 (7th Cir.1994) (citing *McDonnell v. Cournia,* 990 F.2d 963, 969 (7th Cir.1993)); *accord Chapple v. Nat'l Starch & Chem. Co.,* 178 F.3d 501, 504 (7th Cir.1999); *Weihaupt v. Am. Med. Ass'n,* 874 F.2d 419, 428 (7th Cir.1989), but only with appropriate citations to relevant admissible evidence. *See* Local Rule 56.1; *Brasic v. Heinemann's Inc., Bakeries,* 121 F.3d 281, 286 (7th Cir.1997); *Forman v. Richmond Police Dept.,* 104 F.3d 950, 957 (7th Cir. 1997); *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 923–24 (7th Cir.1994). Evidence sufficient to support every essential element of the claims on which the opposing party bears the burden of proof must be cited. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In considering a summary judgment motion, a court must draw all reasonable inferences in the light most favorable to the opposing party. *See Johnson Worldwide Assocs., Inc. v. Zebco Corp.,* 175 F.3d 985, 988 (Fed.Cir.1999); *Wollin,* 192 F.3d at 621; *Thomas & Betts Corp. v. Panduit Corp.,* 138 F.3d 277, 291 (7th Cir.1998); *Spraying Sys. Co. v. Delavan, Inc.,* 975 F.2d 387, 392 (7th Cir.1992). If a reasonable fact finder could find for the opposing party, then summary judgment is inappropriate. *Stop–N–Go,* 184 F.3d at 677; *Shields Enters., Inc. v. First Chi. Corp.,* 975 F.2d 1290, 1294 (7th Cir.1992). When the standard embraced in Rule 56(c) is

met, summary judgment is mandatory. *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Thomas & Betts*, 138 F.3d at 291; *Shields Enters.*, 975 F.2d at 1294.

## III. *RELATED MOTIONS*

Contemporaneously with the instant motion for summary judgment, Lilly filed objections to certain testimony of John H. Griffin, Ph.D. ("Dr. Griffin"), and to certain testimony of Dr. Ashley Stevens ("Dr. Stevens"). The Court finds that for purposes of the instant motion Lilly's objections to this testimony should be **OVERRULED.**

▮ In addition, on January 26, 2006, Lilly submitted supplemental authority, *Stern v. Trustees of Columbia University*, 434 F.3d 1375 (Fed.Cir.2006), and its arguments regarding the applicability of *Stern* to the facts of this case. On February 2, 2006, Defendants moved to strike Lilly's submission of *Stern*, in part because Lilly failed to seek permission to file such supplemental authority, but mainly because Defendants felt Lilly had unfairly used the opportunity to compare the facts of *Stern* to the facts of the instant case. In their brief on the motion to strike, Defendants delineated how they would differentiate the facts of *Stern* from the instant case.

The Court finds that Lilly did not err in submitting additional authority on the inventorship issue. However, it did err when it sought to argue its position further along with its submission before seeking leave of the Court to further brief the issue already before it. As such, the Court will **GRANT** the motion to strike with respect to Lilly's argument, but **DENY** the motion to strike with respect to submission of the supplemental authority itself.

Defendants' Joint Motion to Strike is **GRANTED in part and DENIED in part.**

## IV. *DISCUSSION*

▮ Because Lilly seeks summary judgment on the issue of whether or not the Doctors were inventors of the patents in suit, the standard for showing inventorship frames the Court's analysis. An inventor may not have contributed to the subject matter of every claim of an invention, therefore, like most claims under patent law, the inventorship analysis begins with construction of the disputed claims. *See Gemstar–TV Guide v. Int'l Trade Comm'n*, 383 F.3d 1352, 1381–82 (Fed.Cir. 2004). Then, the fact finder must compare "the alleged contributions of each asserted co-inventor with the subject matter of the correctly construed claim to determine whether the correct inventors were named." *Id.* at 1382 (citing *Trovan, Ltd. v. Sokymat SA*, 299 F.3d 1292, 1302 (Fed. Cir.2002); *Ethicon Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460–61 (Fed.Cir. 1998)).

▮ Each alleged co-inventor, Dr. Crabtree and Dr. Plutzky, must establish his co-inventorship by clear and convincing evidence. *See id.* "To meet the burden of clear and convincing evidence, the [Doctors] must prove their contribution to the conception of the invention with more than their own testimony concerning the relevant facts." *Id.* The Court uses a "rule of reason analysis" to determine whether each inventor's testimony has been sufficiently corroborated. *See id.* The "rule of reason analysis" requires an evaluation of all pertinent evidence, including "records made contemporaneously with the inventive process[,]" oral testimony from someone other than the Doctors, and other independent circumstantial evidence. *Id.* However, the preferable source is contemporaneous documentary evidence. *See id.* (citing *Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1350–51 (Fed.Cir.2001)).

■ Conception is the touchstone of inventorship. *See id.* at 1381 (citing *Fina Oil & Chem. Co. v. Ewen,* 123 F.3d 1466, 1473 (Fed.Cir.1997)). " 'Conception is the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice.' " *Id.* (quoting *Hybritech Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1376 (Fed. Cir.1986) (internal quotations omitted by *Gemstar–Tv* court)). In order to describe an invention with particularity, an inventor must have

> both (1) the idea of the invention's structure and (2) possession of an operative method of making it.... Thus, with regard to a claimed chemical compound, conception requires that the inventor "be able to define" the compound "so as to distinguish it from other materials, and to describe how to obtain it."

*Invitrogen Corp. v. Clontech Labs., Inc.,* 429 F.3d 1052, 1063 (Fed.Cir.2005) (quoting *Amgen, Inc. v. Chugai Pharm. Co.,* 927 F.2d 1200, 1206 (Fed.Cir.1991)).

In order to succeed on his claim, each of the Doctors must show that he " 'contribute[d] in some significant manner to the conception of the invention.' " *Gemstar–Tv Guide,* 383 F.3d at 1381 (quoting *Fina Oil & Chem.,* 123 F.3d at 1473).

■ Lilly contends that neither Dr. Crabtree nor Dr. Plutzky is a co-inventor of the patents in suit because neither man made a significant contribution to the relevant claims. At the hearing on this matter, the parties focused on two claims of the '624 patent, claim 1 and claim 12. Claim 1 and claim 12 state, in relevant part:

> 1. A constructed DNA compound that comprises double-stranded deoxyribonucleic acid that encodes a polypeptide with human protein C activity, wherein the coding strand is: [a sequence of A, G, C, T, R1N, RM, 5′, and 3′ that are further defined by claim 1].

* * *

> 12. A method of producing a polypeptide with human protein C activity in a eukaryotic host cell, said method comprising:
>
> A. transforming said eukaryotic host cell with a recombinant DNA vector, said vector comprising:
>
> (i) a DNA sequence that provides for autonomous replication or chromosomal integration of said vector in said host cell;
>
> (ii) a promoter and translational activating sequence functional in said host cell; and
>
> (iii) a DNA compound of claim 1 positional in transcriptional and translational activating sequence, provided that when N = 1, said translational activating sequence does not encode a translational start codon;
>
> B. culturing said host cell transformed in step A under conditions suitable for gene expression.

'624 Patent, col. 58, $l.$ 1 to col. 59, $l.$ 36. Lilly contends that claim 1 requires (1) an artificially created DNA sequence, that does not contain naturally occurring DNA, that (2) encodes a polypeptide with (3) human protein C activity, "wherein the coding strand is" the sequence listed in claim 1, and where (4) "protein C activity" is defined in the '624 patent as "any property of human protein C responsible for biological function or antihuman protein C antibody binding activity." '624 Patent, col. 4, $ll.$ 8–10. In contrast, the Doctors argue that the "constructed DNA compound" language in claim 1 requires (1) any DNA sequence produced by the intervention of human technology (2) obtained

from any type of DNA that (3) codes for at least the sequence listed in claim 1.

For purposes of the Court's analysis of the present motion for summary judgment, the Court finds that the record evidence supports a construction for the disputed language in claim 1 that requires "human-made" DNA with the coding sequence as written in claim 1. First, there is no dispute that the language of claim 1 was modified to add "constructed DNA compound" upon rejection by the patent office of the prior language that include naturally-occurring DNA. Therefore, the term "constructed DNA compound" must refer only to human-made or artificially created DNA. Second, claim 1 is clear that the "constructed DNA compound" must have the coding sequence listed in claim 1, no more, no less, because the claim explicitly states that "the coding strand is," not that the coding strand is "comprised of" or "has at least." The "constructed DNA compound" may include other non-coding portions, however, it absolutely must contain the coding sequence as it is set forth in the claim.

Turning now to the parties' arguments regarding conception and the Doctors' contribution to conception of the patents in suit, Defendants claim that the evidence is undisputed that they provided Lilly with the pHC–8 clone, which contained approximately 40% of the coding sequence claimed by the patents in suit and provided a control for all further experimentation, therefore, the Doctors should be co-inventors of the patents in suit. Moreover, Dr. Crabtree contends that he also provided human genomic clones that led to Dr. Long's isolation of pHC–1 and Beckmann's isolation of pBHC–12, provided transfection protocols that led to Dr. Little's expression of protein C as described by the patents in suit and recommended the FAZA cell line, which also led to the expression of protein C as described in the patents in suit. Defendants contend that these contributions

also evidence that Dr. Crabtree should have been a named inventor. In essence, Defendants argue that the Doctors made easier Lilly's conception of the claims in the patents in suit, or collaborated on steps that led to the conception of the claims, therefore, the Doctors should have been named as co-inventors of the patents in suit.

In contrast, Lilly argues that there is no clear and convincing evidence that the Doctors conceived of any of the claims of the patents in suit. Lilly does not concede that the Doctors' provided purified clones of any portion of protein C, and even if they did, Lilly argues that it was not until Dr. Long and Beckmann had identified in their lab notebooks that they had the entire sequence for protein C that any of the claims of the patents in suit had been "conceived" as that term is used to describe the invention of a chemical compound. Moreover, the actual construction of the entire sequence was made later by Dr. Santerre, without any use of pHC–8. In addition, Lilly contends that the provision of a protocol to Lilly without more does not add to the conception of the claims of the patents in suit. Likewise, Dr. Crabtree's provision of the FAZA cell line to Lilly did not contribute to the conception to use a certain type of cell, which was done by Lilly scientists.

The Court finds that Defendants have not evidenced a material question of fact that the Doctors clearly and convincingly conceived of the claims of the patents in suit. At the hearing on the instant motion, the Court specifically asked counsel from both sides to explain conception in terms of the patents in suit and to point to evidence that the Doctors contributed to the conception. The case law is clear that when a chemical compound is patented, conception has two steps: (1) to define the compound so that one can distinguish it

from others and (2) to describe how to obtain it. *See Invitrogen,* 429 F.3d at 1063. There is no question that in the case at bar, the conception requires identification of a DNA coding sequence that has protein C activity. The evidence presented to the Court is that Dr. Plutzky sent something to Lilly that contained some cDNA clone of what Dr. Plutzky thought was protein C, and that Dr. Long received something from Dr. Crabtree's laboratory that looked like mixed colonies of cDNA of protein C. Pl.'s Exh. 17, Plutzky L.NB, at C 000467–89; Pl.'s Exh. 10, Long L.NB, at CP 2502 0946A. Dr. Long eventually sequenced that material and described it in his lab notebook as part of the DNA sequence for protein C. Pl.'s Exh. 10, Long L.NB, at CP 2502 0946A; *Id.* at CP 2502 0954A–55A; *Id.* at CP 2502 0966A–75A. However, it was not until later that Dr. Long and Beckmann isolated other cDNA clones from which the entire sequence of protein C was identified. *Id.* at CP 2502 0988A–96A; *Id.* at CP 2502 1031A; Pl.'s Exh. 12, Beckmann L.NB, at CP 2524 386–465; Pl.'s Exh. 9, Lilly Progress Rep., Jan. 6, 1984–July 15, 1984, at 2–3. According to the standard for conception of a chemical compound, it was not until this later identification that anyone had "conceived" of the sequence described by claim 1 of the '624 patent. Furthermore, there is no question that Dr. Santerre's work to combine pHC–1 and pBHC–12 into a single molecule completed the "conception" of the coding sequence in claim 1, a step that clearly did not include any of the Doctors' claimed contribution.

The Doctors argue that their work made it easier for Lilly to identify the entire sequence for protein C, therefore, they too contributed to the conception of the claims of the patents in suit. But, this ignores the definition of "conception" set forth in the case law. Moreover, to adopt the Doctors' view, the Court would have to accept that anyone who made it easier for Lilly to

do its research should be a named inventor on its patents. This argument is not supported by the plain definition of conception as it has been interpreted by the Federal Circuit to apply to chemical compounds like the one in the patents in suit.

Similarly to the provision of pHC–8, Beckmann's use of "genomic clones," apparently provided to Lilly by Dr. Crabtree, did not lead to the conception of the invention claimed by the patents in suit. The conception occurred after Beckmann had isolated pBHC–12. Pl.'s Exh. 12, Beckmann L.NB, at CP 2524 465. Furthermore, there is no evidence that Dr. Crabtree ever suggested the use of the genomic clones to Beckmann in his efforts to obtain a cDNA sequence that encoded protein C. Any tests Beckmann used to confirm that his pBHC–12 clone was in fact protein C are not part of the claimed invention, therefore, neither Dr. Plutzky nor Dr. Crabtree could be a co-inventor by simply providing pHC–8 or genomic clones used as confirmation tools by Lilly scientists who determined the coding sequence claimed in the patens in suit. *Accord Ethicon, Inc. v. U.S. Surgical Corp.,* 135 F.3d 1456, 1460 (Fed.Cir.) (stating that "one does not qualify as a joint inventor by merely assisting the actual inventor after conception of the claimed invention"), *cert. denied* 525 U.S. 923, 119 S.Ct. 278, 142 L.Ed.2d 229 (1998); *Burroughs Wellcome Co. v. Barr Labs., Inc.,* 40 F.3d 1223, 1230–31 (Fed.Cir.1994) (finding that the running of tests to confirm an idea is not conception), *cert. denied,* 516 U.S. 1070, 116 S.Ct. 771, 133 L.Ed.2d 724 (1996).

■ With respect to the transfection protocol provide to Lilly by Dr. Crabtree, there is no reference to a specific protocol in the claims of the patents in suit, and there is no evidence to rebut indications that the transfection protocol was well known in the art. There are claims that

require a transfection or transforming step, however, the patent specification suggests that protocols other than the one used by Lilly would suffice. '624 Patent, col. 53, *ll.* 28–31. Moreover, even though Lilly had problems with the transformation step prior to Dr. Little's work with Dr. Crabtree's protocol, as modified by the addition of vitamin K, suggestions of known protocols or known test methods by others does not lead to an inference that the contributor is a co-inventor. *See Bd. of Educ. ex rel. Bd. of Trustees of Fla. State Univ. v. Am. Biosci., Inc.,* 333 F.3d 1330, 1341–42 (Fed.Cir.2003) (hereinafter, *ABI); Ethicon,* 135 F.3d at 1460; *Hess v. Advanced Cardiovascular Sys., Inc.,* 106 F.3d 976, 980–81 (Fed.Cir.), *cert. denied,* 520 U.S. 1277, 117 S.Ct. 2459, 138 L.Ed.2d 216 (1997).

■ With respect to the provision of the FAZA cell line by Dr. Crabtree, even if the Court accepts as true Defendants' assertion that Dr. Crabtree suggested the use of the FAZA cell line for the expression of protein C, there is no dispute that the idea for the type of cell line Lilly needed to complete this step was formed at Lilly. Def.'s Exh. 16, Little Jan.-July 1985 Rep., at CP 28 0562–64 (stating specifically what type of cell line Lilly sought for this phase of the project). The specification of the patents in suit also suggest that such cell lines were readily available from public sources. *See, e.g.,* '624 Patent, col. 13. Moreover, similarly to the suggestion of a known protocol, an inference that Dr. Crabtree suggested the use of a known cell line is not clear and convincing evidence that Dr. Crabtree conceived of any of the claimed subject matter of the patents in suit. *See Ethicon,* 135 F.3d at 1460 (stating that a scientist "who simply provides the inventor with well-known principles or explains the state of the art without ever having 'a firm and definite idea' of the claimed combination as a whole does not qualify as a joint inventor").

In summary, there is no clear and convincing evidence that the Doctors conceived of any of the claimed inventions in the patents in suit.

## V. *CONCLUSION*

For the foregoing reasons, the Court **GRANTS** plaintiff's, Eli Lilly & Company, Motion for Summary Judgment on Defendants' Correction of Inventorship Claim. Defendants', Dr. Gerald Crabtree and Dr. Jorge Plutzky, Correction of Inventorship Claim is hereby **DISMISSED** with prejudice. Defendants' Joint Motion to Strike or, Alternatively to Respond to, Lilly's Citation to Supplemental Authority is **GRANTED in part and DENIED in part.** Plaintiff's Objections to Testimony from John H. Griffin, Ph.D., and Plaintiff's Objections to Testimony by Dr. Ashley Stevens are **OVERRULED.**